## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| JULIE HUNTER, an individual; and TALON HUNTER, a minor, BY AND THROUGH HIS MOTHER AND NEXT FRIEND, JULIE HUNTER, <br><br> Plaintiff, <br><br> v. <br><br> GLAXOSMITHKLINE, LLC, an American limited liability company, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) **Case Number: 2:15-cv-00544-** <br> ) <br> ) <br> ) <br> ) <br> ) |

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs Talon Hunter, a minor by and through his mother and next friend Julie Hunter, and Julie Hunter, individually, by and through their undersigned counsel, and hereby file Plaintiffs' First Amended Complaint as a matter of course pursuant to Rule 15(a)(1)(B), within twenty-one (21) days of the first responsive pleading. *See* Fed. R. Civ. P. 15(a)(1).

## JURISDICTION AND VENUE

1.      Plaintiff Julie Hunter is a resident of Chilton County, Alabama and over nineteen (19) years of age.  Plaintiff Julie Hunter is the mother and next friend of Talon Hunter.

1

2.     Plaintiff Talon Hunter is a minor, an eight (8) year old child, who is a resident of Chilton County, Alabama.  Plaintiff Talon Hunter therefore brings this suit by and through his mother and next friend, Julie Hunter, pursuant to Rule 17(c) of the Federal Rules of Civil Procedure.  *See* FED. R. CIV. P. 17(c).

3.     Defendant GlaxoSmithKline, LLC ("Defendant GSK"), is a limited liability corporation, organized under the laws of the State of Delaware. Defendant GSK's sole member is GlaxoSmithKline Holdings, Inc., which is a Delaware corporation, and which has identified its principal place of business in Wilmington, Delaware.  Defendant GSK designed, manufactured and distributed Zofran, the drug that is the subject of this lawsuit, into the stream of commerce with the expectation that it would be purchased by consumers in Alabama. Defendant GSK has at all relevant times conducted business in Alabama and has derived substantial revenue from products, including Zofran, sold in Alabama.

4.     Defendant GSK is the successor in interest to Glaxo, Inc. and Glaxo Wellcome Inc.  Glaxo, Inc. was the sponsor of the original New Drug Application for Zofran.  Glaxo, Inc.  authored the original package insert and labeling for Zofran, including warnings and precautions attendant to its use.  Glaxo Wellcome Inc. sponsored additional New Drug Applications for Zofran, monitored and evaluated post-market adverse event reports arising from Zofran, and authored product labeling for Zofran.  The term Defendant GSK used herein refers to

Defendant GSK, its predecessors Glaxo, Inc. and Glaxo Wellcome Inc., and other Defendant GSK predecessors and affiliates that discovery reveals were involved in the testing, development, design, manufacture, marketing, sale and/or distribution of Zofran.

5.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and Defendants and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

## FACTS COMMON TO ALL COUNTS

6.     Zofran is a drug developed by Defendant GSK to treat severe nausea on cancer patients resulting from chemotherapy or radiation therapy.

7.     Zofran was approved by the U.S. Food and Drug Administration ("FDA") for cancer patients undergoing chemotherapy or radiation therapy.

8.     Despite the fact that the FDA did not approve Zofran for treatment of "morning sickness" (nausea and vomiting related) in pregnant women, Defendant GSK marketed Zofran "off label" as a safe and effective treatment for morning sickness.  These representations were known by Defendant GSK to be false and reckless since Defendant GSK performed no studies on the effects of Zofran on a pregnant mother or child *in utero.* While another anti-nausea prescription drug approved by the FDA for treating morning sickness in pregnant women was

clinically tested before being marketed to pregnant women, not a single clinical trial was conducted by Defendant GSK before marketing Zofran to pregnant women and their doctors. Defendant GSK made the decision not to seek FDA approval for Zofran use for the treatment of morning sickness in pregnant women and not to conduct studies because it would have to disclose birth defects from the drug, thus losing profits that could be made from off-label promotion of Zofran for morning sickness.

9. As a result of Defendant GSK's fraudulent marketing campaign, Zofran was prescribed to pregnant women throughout the United States who thought they were receiving and using a safe drug for the treatment of morning sickness. They did not know and could not have known that Zofran had not been subjected to clinical trials and studies necessary to determine the safety of the drug for pregnant women and their yet unborn children.

10. Defendant GSK knew before marketing Zofran that the drug was not safe for treatment of morning sickness and did not disclose this information to pregnant women or their doctors. In the 1980's dangers posed by the drug for use by pregnant women were learned through animal studies Defendant GSK conducted which showed evidence of toxicity, intrauterine deaths and malformations in offspring, and further showed that Zofran's active ingredient transferred through the placental barrier of pregnant mammals to fetuses. A later

study conducted in humans confirmed that ingested Zofran readily crossed the human placenta barrier and exposed fetuses to substantial concentrations. Defendant GSK did not disclose this information to pregnant women or their physicians.

11.   In 1992 Defendant GSK began receiving mounting evidence of reports of birth defects associated with Zofran. Defendant GSK had received at least 32 such reports by 2000, and has received more than 200 such reports to date. Defendant GSK never disclosed these reports to pregnant women or their physicians. In addition, scientists have conducted large-scale epidemiological studies that have demonstrated an elevated risk of developing birth defects such as those suffered in this case. Defendant GSK has not disclosed this to pregnant women or their physicians. Instead, Defendant GSK sales representatives specifically marketed and promoted Zofran as a morning sickness drug throughout the relevant time periods discussed herein.

12.   In 2012, Defendant GSK pled guilty to criminal charges lodged by the United States of America, through the Department of Justice, for its "off-label" promotion of its drugs for uses never approved by the FDA.

13.   At or around the same time, Defendant GSK also entered civil settlements with United States that included more than $1 billion in payments to the federal government for its illegal marketing of various drugs, including Zofran

specifically.

14.     Defendant GSK's written settlement agreement with the United States reports that Defendant GSK:

>  (a)  "promoted the sale and use of Zofran for a variety of conditions other than those for which its use was approved as safe and effective by the FDA (including hyperemesis and pregnancy-related nausea)"

>  (b)  "made and/or disseminated unsubstantiated and false representations about the safety and efficacy of Zofran concerning the uses described in subsection (a) [hyperemesis and pregnancy-related nausea]"

>  (c)  "offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Zofran"

(Settlement Agreement, p. 5, July 2, 2012.)

15.     Defendant GSK's conduct has caused devastating, irreversible, and life-long consequences and suffering to innocent newborns and their families, like Plaintiffs herein.

16.     Plaintiff's minor child, Talon Hunter, was born in 2006 with numerous congenital defects after his mother, Plaintiff Julie Hunter, was prescribed and began taking Zofran beginning early in her first trimester of pregnancy to alleviate

the symptoms of morning sickness. Soon after birth, Plaintiff Talon Hunter was diagnosed with a high, narrow pallet deformity, extra digits, distended kidney, ureteral disorder. He was later diagnosed with a seizure disorder. Plaintiff Talon Hunter is a special needs child. He is nonverbal. His reactions are very delayed. He has been nonverbal and exhibited delayed reactions since birth.

17. Had Plaintiff known the truth about Zofran's unreasonable risk of harm, long concealed by Defendant GSK, she would never have taken Zofran, and her child would never had been injured as described herein.

18. Plaintiff brings claims for compensatory and punitive damages, as well as equitable relief in an effort to ensure that similarly situated mothers-to-be are fully informed about the risks, benefits and alternatives attending drugs marketed for use in pregnant women, and such other relief deemed just and proper arising from injuries and birth defects as a result of exposure to Zofran.

## ADDITIONAL FACTS CONCERNING ZOFRAN

19. Zofran is a prescription drug indicated for the prevention of chemotherapy-induced nausea and vomiting, radiation therapy-induced nausea and vomiting and post-operative nausea and/or vomiting:

INDICATIONS AND USAGE

1. Prevention of nausea and vomiting associated with highly emetogenic cancer **chemotherapy**, including cisplatin greater than

mg/m2.

2. Prevention of nausea and vomiting associated with initial and repeat courses of moderately emetogenic **cancer chemotherapy**.

3. Prevention of **nausea and vomiting associated with radiotherapy** in patients receiving either total body irradiation, single high-dose fraction to the abdomen, or daily fractions to the abdomen.

4. Prevention of **postoperative nausea and/or vomiting.**

(GSK, Zofran Prescribing Information, Sept. 2014) (emphasis added.)

20. The medical term for nausea and vomiting is emesis, and drugs that prevent or treat nausea and vomiting are called anti-emetics.

21. Zofran is part of a class of anti-emetics called selective serotonin 5HT3 receptor antagonists. The active ingredient in Zofran is ondansetron hydrochloride, which is a potent and selective antagonist at the 5-hydroxytryptamine receptor type 3 (5-HT3).

22. Although 5-hydroxytryptamine (SHT) occurs in most tissues of the human body, Zofran is believed to block the effect of serotonin at the 5HT3 receptors located along vagal afferents in the gastrointestinal tract and at the receptors located in the area postrema of the central nervous system (the structure in the brain that controls vomiting). Put differently, Zofran antagonizes, or inhibits, the body's serotonin activity, which triggers nausea and vomiting.

23. Zofran was the first 5HT3 receptor antagonist approved for marketing in the United States. Other drugs in the class of 5HT3 receptor antagonist include Kytril® (granisetron) (FDA-approved 1994), Anzemet® (dolasetron) (FDA-approved 1997), and Aloxi® (palonosetron) (FDA-approved 2003).

24. Zofran is available as an injection (2 mg/mL), a premixed injection (32 mg/50m1 and 4 mg/50 ml), oral tablets (4 mg, 8 mg and 24 mg); orally disintegrating tablets (4 mg and 8 mg) and an oral solution (4 mg/5 mL).

25. More specifically, Defendant GSK has obtained FDA approval for the following formations of Zofran:

    a. NDA 20-007 — Zofran Injection (FDA approved January 4, 1991)

    b. NBA 20-103 — Zofran Tablets (FDA approved December 31, 1992)

    c. NDA 20-403 — Zofran Premixed Injection (FDA approved January 31, 1995)

    d. NDA 20-605 — Zofran Oral Solution (FDA approved January 24, 1997)

    e. NBA 20-781 — Zofran (a/k/a Zofran-Zydis) Orally Disintegrating Tablets (FDA approved January 27, 1999)

26. The FDA has never approved Zofran for the treatment of morning sickness or any other condition in pregnant women.

27. For Defendant GSK to market Zofran lawfully for the treatment of

morning sickness in pregnant women, it must first adequately test the drug (including performing appropriate clinical studies) and formally submit to the FDA evidence demonstrating that the drug is safe and effective for treatment of morning sickness.

28. A team of the FDA's physicians, statisticians, chemists, pharmacologists, microbiologists and other scientists would then have an opportunity to: (a) review the company's data and evidence supporting its request for approval to market the drug; and (b) determine whether to approve the company's request to market the drug in the manner requested. Without first obtaining approval to market a drug for the treatment of pregnant women, a pharmaceutical company may not legally market its drug for that purpose.

29. Defendant GSK has not performed any clinical studies of Zofran use in pregnant women. Defendant GSK, however, had the resources and know-how to perform such studies, and such studies were performed to support another prescription drug that, unlike Zofran, is FDA-approved for the treatment of morning sickness.

30. Defendant GSK also has not submitted to the FDA any data demonstrating the safety or efficacy of Zofran for treating morning sickness in pregnant women. Instead, Defendant GSK has illegally circumvented the FDA-approval process by marketing Zofran for the treatment of morning sickness in

pregnant women without applying for the FDA's approval to market Zofran to treat that condition or any other condition in pregnant women. This practice is known as "off-label" promotion, and in this case it constitutes fraudulent marketing.

31.     At all relevant times, Defendant GSK was in the business of and did design, research, manufacture, test, package, label, advertise, promote, market, sell and distribute Zofran, and Defendant GSK continues to market and sell Zofran today.

### DEFENDANT GSK's Knowledge That Zofran Presents an Unreasonable Risk of Harm to Babies Who Are Exposed to It During Pregnancy

32.     Since at least the l980s, when Defendant GSK received the results of the preclinical studies that it submitted in support of Zofran's NDA 20-007, Defendant GSK has known of the risk that Zofran ingested during pregnancy in mammals crosses the placental barrier to expose the fetus to the drug. For example, at least as early as the mid-1980s, Defendant GSK performed placental-transfer studies of Zofran in rats and rabbits, and reported that the rat and rabbit fetuses were exposed prenatally to Zofran during pregnancy.

33.     The placental transfer of Zofran during human pregnancy at concentrations high enough to cause congenital malformations has been independently confirmed and detected in every sample of fetal tissue taken in a

published study involving 41 pregnant patients. The average fetal tissue concentration of Zofran's active ingredient was 41% of the corresponding concentration in the mother's plasma.

34. Defendant GSK reported four animal studies in support of its application for approval of NBA 20-007: (1) Study No. R 10937 I.V. Segment II teratological study of rats; (2) Study No. R10873 1.V. Segment II teratological study of rabbits; (3) Study No. R10590 Oral Segment II teratological study of rats; (4) Study No. L10649 Oral Segment II teratological study of rabbits. These preclinical teratogenicity studies in rats and rabbits were stated by the sponsor, Defendant GSK, to show no harm to the fetus, but the data also revealed clinical signs of toxicity, premature births, intrauterine fetal deaths, and impairment of ossification (incomplete bone growth).

35. Study No. R10937 was a Segment II teratological study of pregnant rats exposed to Zofran injection solution. Four groups of 40 pregnant rats (160 total) were reportedly administered Zofran through intravenous (I.V.) administration at doses of 0, 0.5, 1.5, and 4 mg/kg/day, respectively. Clinical signs of toxicity that were observed in the pregnant rats included "low posture, ataxia, subdued behavior and rearing, as well as nodding and bulging eyes." No observations were reported as teratogenic effects.

36. Study No. R10873 was a Segment II teratological study of pregnant

rabbits exposed to Zofran injection solution. Four groups of 15 pregnant rabbits (60 total) were reportedly given Zofran doses of 0, 0.5, 1.5, and 4 mg/kg/day, respectively. In this study, there was a reported increase in the number of intra-uterine deaths in the 4 mg/kg group versus lower-dose groups. The study also reported maternal weight loss in the exposed groups. Developmental retardation in off-spring and fetuses were noted — namely, areas of the parietal (body cavity) were not fully ossified, and the hyoid (neck) failed to ossify completely.

37. <u>Study No. R10590</u> Oral Segment II teratological study of rats. Four groups of 30 pregnant rats (120 total) were given Zofran orally at doses of 0, 1, 4 and 15 mg/kg/day, respectively. Subdued behavior, labored breathing, which is a symptom of congenital heart defects, and dilated pupils were observed in the 15 mg/kg/day group. Body weight, gestational duration and fetal examinations were reported as normal, but "slight retardation in skeletal ossification" was noted in the offspring.

38. <u>Study No. Ll0649</u> Oral Segment II teratological study of rabbits. Four groups of 14-18 pregnant rabbits (56-64 total) were given Zofran orally at doses of 0, 1, 5.5 and 30 mg/kg/day. The study reported lower maternal weight gain in all of the exposed groups, as well as premature delivery and "total litter loss," referring to fetal deaths during pregnancy in the 5.5 mg/kg/day group. Examination of the fetuses showed "slight developmental retardation as evident by incomplete

ossification or asymmetry of skeleton."

39.    Even if animal studies do not reveal evidence of harm to a prenatally exposed fetus, that result is not necessarily predictive of human response. For example, a drug formerly prescribed to alleviate morning sickness, thalidomide, is an infamous teratogenic in humans, but animal studies involving the drug failed to demonstrate such an increased risk of birth defects in animals. Defendant GSK conducted studies of thalidomide and its toxicity before Defendant GSK developed Zofran and before it marketed Zofran for the treatment of morning sickness in pregnant women. Moreover, since at least 1993, Defendant GSK has stated in its prescribing information for Zofran that "animal reproduction studies are not always predictive of human response." Therefore, Defendant GSK has been aware since at least when it began marketing and selling Zofran that Defendant GSK could not responsibly rely on its animal studies as a basis for promoting Zofran use in pregnant women. But that is what Defendant GSK did.

## Early Reports of Zofran-Related Birth Defects to Defendant GSK

40.    At least as early as 1992, Defendant GSK began receiving reports of birth defects associated with the use of Zofran by pregnant women.

41.    By 2000, Defendant GSK had received at least 32 reports of birth defects arising from Zofran treatment in pregnant women. These reports included congenital heart disease, dysmorphism, intrauterine death, stillbirth, kidney

malformation, congenital diaphragmatic anomaly, congenital musculoskeletal anomalies, and orofacial anomalies, among others.

42.    In many instances, Defendant GSK received multiple reports in the same month, the same week and even the same day. For example, on or about September 13, 2000, GSK received three separate reports involving Zofran use and adverse events. For two of those incidents, the impact on the baby was so severe that the baby died.

43.    From 1992 to the present, Defendant GSK has received more than 200 reports of birth defects in children who were exposed to Zofran during pregnancy.

44.    The most commonly reported birth defects arising from Zofran use during pregnancy and reported to Defendant GSK were congenital heart defects, though multiple other defects such as orofacial defects, intrauterine death, stillbirth and severe malformations in newborns were frequently reported.

45.    The number of events actually reported to Defendant GSK was only a small fraction of the actual incidents.

**Epidemiology Studies Examining the Risk of Congenital Heart Defects in Babies Who Were Exposed to Zofran During Pregnancy**

46.    Epidemiology is a branch of medicine focused on studying the causes, distribution, and control of diseases in human populations.

47.    Three recent epidemiological studies have examined the association between prenatal exposure to Zofran and the risk of congenital heart defects in

babies. These studies include: (1) Pasternak, et al., *Ondansetron in Pregnancy and Risk of Adverse Fetal Outcomes,* New England Journal of Medicine (Feb. 28, 2013) (the "Pasternak Study"); (2) Andersen, et al., *Ondansetron Use in Early Pregnancy and the Risk of Congenital Malformations— A Register Based Nationwide Control Study,* presented at International Society of Pharmaco-epidemiology, Montreal, Canada (2013) (the "Andersen Study"); and (3) Danielsson, et al., *Ondansetron During Pregnancy and Congenital Malformations in the Infant* (Oct. 31, 2014) (the "Danielsson Study").

48. Each of these studies includes methodological characteristics tending to bias its results toward under-reporting the true risk of having a child with a birth defect. Notwithstanding these characteristics biasing the results toward the null hypothesis, all three studies show elevated risk ratios for cardiac malformations, including risk ratios greater than 2.0. In other words, the studies report that a mother exposed to Zofran had more than a doubled risk of having a baby with a congenital heart defect as compared to a mother who did not ingest Zofran during pregnancy.

49. The Pasternak Study included data from the Danish National Birth Registry and examined the use of Zofran during pregnancy and risk of adverse fetal outcomes. Adverse fetal outcomes were defined as: spontaneous abortion, stillbirth, any major birth defect, pre-term delivery, low birth weight, and small

size for gestational age. There were 608,385 pregnancies between January 2004 and March 31, 2011 examined. The unexposed group was defined as women who did not fill a prescription for ondansetron during the exposure time window. The exposure time window was defined as the first 12 week gestational period. Notably, the median fetal age at first exposure to Zofran was ten weeks, meaning that half of the cases were first exposed to Zofran after organogenesis (organ formation). This characteristic of the study led to an under-reporting of the actual risk of prenatal Zofran exposure. The study's supplemental materials indicated that women taking Zofran during the first trimester, compared to women who did not take Zofran, were 22% more likely to have offspring with a septal defect, 41% more likely to have offspring with a ventricular septal defect and greater than four-times more likely to have offspring with atrioventricular septal defect.

50.    The Andersen Study was also based on data collected from the Danish Medical Birth Registry and the National Hospital Register, the same data examined in the Pasternak Study. The Andersen study examined the relationship between Zofran use during the first trimester and subgroups of congenital malformations. Data from all women giving birth in Denmark between 1997 and 2010 were included in the study. A total of 903,207 births were identified in the study period with 1,368 women filling prescriptions for Zofran during the first trimester. The Andersen Study therefore used a larger data set (thirteen years) compared to the

Pasternak Study (seven years). Exposure to the drug was also defined as filling a prescription during the first trimester, and prescription data were obtained from the National Prescription Registry. The Andersen study reported that mothers who ingested Zofran during their first trimester of pregnancy were more likely than mothers who did not to have a child with a congenital heart defect, and had a two- to four-fold greater risk of having a baby with a septal cardiac defect.

51.     The Danielsson Study investigated risks associated with Zofran use during pregnancy and risk of cardiac congenital malformations from data available through the Swedish Medical Birth Registry. The Swedish Medical Birth Registry was combined with the Swedish Register of Prescribed Drugs to identify 1,349 infants born to women who had taken Zofran in early pregnancy from 1998-2012. The total number of births in the study was 1,501,434 infants, and 43,658 had malformations classified as major (2.9%). Among the major malformations, 14,872 had cardiovascular defects (34%) and 10,491 had a cardiac septum defect (24%). The Danielsson study reported a statistically significantly elevated risk for cardiovascular defects for mothers taking Zofran versus those who did not. The results reported that the mothers who took Zofran during early pregnancy had a 62% increased risk of having a baby with a cardiovascular defect. Further, mothers who took Zofran during pregnancy had a greater than two-fold increased risk of having a baby with a septal cardiac defect, compared to mothers who did not take

Zofran during pregnancy.

52.   In summary, since at least 1992, Defendant GSK has had mounting evidence showing that Zofran presents an unreasonable risk of harm to babies who are exposed to the drug during pregnancy. Defendant GSK has been aware that Zofran readily crosses human placental barriers during pregnancy. Defendant GSK has also been aware that the animal studies of Zofran cannot reliably support an assertion that Zofran can be used safely or effectively in pregnant women. Since 1992, Defendant GSK has received hundreds of reports of major birth defects associated with prenatal Zofran exposure. Defendant GSK also has had actual and/or constructive knowledge of the epidemiological studies reporting that prenatal Zofran exposure can more than double the risk of developing congenital heart defects. As alleged below, Defendant GSK not only concealed this knowledge from healthcare providers and consumers in the United States, and failed to warn of the risk of birth defects, but Defendant GSK also illegally and fraudulently promoted Zofran to physicians and patients specifically for the treatment of morning sickness in pregnant women.

### Defendant GSK's Failure to Warn of the Risk of Birth Defects Associated with Prenatal Exposure to Zofran

53.   Under federal law governing Defendant GSK's drug labeling for Zofran, Defendant GSK was required to "describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should

be taken if they occur." 21 C.F.R. § 201.57(e).

54.     Defendant GSK was also required to list adverse reactions that occurred with other drugs in the same class as Zofran. *Id.* § 201.57(g).

55.     In the context of prescription drug labeling, "an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence." *Id.*

56.     Federal law also required Defendant GSK to revise Zofran's labeling "**to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.**" *Id* § 201.57(e) (emphasis added).

57.     Defendant GSK has received hundreds of reports of birth defects associated with the non-FDA-approved use of Zofran in pregnant women. Defendant GSK has failed, however, to disclose these severe adverse events to healthcare providers or expectant mothers, including Plaintiff Julie Hunter and her prescribing healthcare provider.

58.     Under 21 C.F.R. § 314.70(c)(2)(i), pharmaceutical companies were (and are) free to add or strengthen — without prior approval from the FDA — a contraindication, warning, precaution, or adverse reaction.

59.     Defendant GSK thus had the ability and obligation to add warnings,

precautions and adverse reactions to the product labeling for Zofran without prior approval from the FDA. Defendant GSK failed to do so.

60.    Under 21 C.F.R. § 201.128, "if a manufacturer knows, or has knowledge of facts that would give him notice, that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug which accords with such other uses to which the article is to be put."

61.    At least as of 1998, Defendant GSK knew well from its off-label promotion and payments to doctors, and its conspicuous increase in revenue from Zofran, and its market analyses of prescription data, that physicians were prescribing Zofran off-label to treat morning sickness in pregnant women and that such usage was associated with a clinically significant risk or hazard — birth defects.

62.    Defendant GSK had the ability and obligation to state prominently in the Indications and Usage section of its drug label that there is a lack of evidence that Zofran is safe for the treatment of morning sickness in pregnant women. Defendant GSK failed to do so, despite Defendant GSK's knowledge that (a) the safety of Zofran for use in human pregnancy has not been established, and (b) there have been hundreds of reports of birth defects associated with Zofran use during pregnancy, and (c) epidemiology studies report an increased risk of birth defects in

babies exposed to Zofran during pregnancy.

63.     From 1993 to the present, despite mounting evidence of the birth defect risk, Defendant GSK's prescribing information for Zofran has included the same statement concerning use of Zofran during pregnancy:

> "**Pregnancy; Teratogenic Effects**: Pregnancy Category B. Reproduction studies have been performed in pregnant rats and rabbits at I.V. doses up to 4 mg/kg per day and have revealed no evidence of impaired fertility or harm to the fetus due to ondansetron. There are, however, no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed."

64.     By contrast, the Product Monograph for Zofran in Canada states "the safety of ondansetron for use in human pregnancy has not been established," and that "the use of ondansetron in pregnancy is not recommended."

65.     In the United States and in Alabama specifically, Defendant GSK has at all relevant times failed to include any warning disclosing any risks of birth defects arising from Zofran use during pregnancy in Zofran's prescribing information or other product labeling.

66.     Defendant GSK's inclusion of the phrase "Pregnancy Category B" in Zofran's prescribing information refers to the FDA's pregnancy categorization scheme applicable to prescription drugs in the United States. The FDA has established five categories to indicate the potential of a drug to cause birth defects if used during pregnancy. The current system of pregnancy labeling consists of five

letter-categories (A, B, C, D, and X, in order of increasing risk).

67. Defendant GSK had the ability, and indeed was required, to update Zofran's label to reflect at best a Pregnancy Category D designation or alternatively a Category X designation for Zofran:

> **Pregnancy Category D. If there is positive evidence of human fetal risk based on adverse reaction data from investigational or marketing experience or studies in humans,** but the potential benefits from the use of the drug in pregnant women may be acceptable despite its potential risks (for example, if the drug is needed in a life-threatening situation or serious disease for which safer drugs cannot be used or are ineffective), the labeling must state: "Pregnancy Category D. See "Warnings and Precautions" section. Under the "Warnings and Precautions" section, **the labeling must state: "[drug] can cause fetal harm when administered to a pregnant woman. . . . If this drug is used during pregnancy, or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to a fetus."**

> 21 C.F.R. § *201.57(f)(6)(i)(d)* (emphasis added).

> **Pregnancy Category X. If studies in animals or humans have demonstrated fetal abnormalities or if there is positive evidence of fetal risk based on adverse reaction reports from investigational or marketing experience**, or both, and the risk of the use of the drug in a pregnant woman clearly outweighs any possible benefit (for example, safer drugs or other forms of therapy are available), the labeling must state: "Pregnancy Category X. See 'Contraindications' section." Under "Contraindications," **the labeling must state: "(Name of drug) may (can) cause fetal harm when administered to a pregnant woman. . .. (Name of drug) is contraindicated in women who are or may become pregnant. If this drug is used during pregnancy, or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to a fetus."**

> *Id* § 20l.57(f)(6)(i)(e) (emphasis added).

68.     Beginning at least in 1992, Defendant GSK had positive evidence of human fetal risk posed by Zofran based on more than 200 reports to Defendant GSK of birth defects, as well as epidemiology studies, and placental-transfer studies reporting on Zofran's teratogenic risk. Defendant GSK has never updated Zofran's labeling to disclose that Zofran can cause fetal harm when administered to a pregnant woman, and Defendant GSK has failed to warn of the potential hazards to a fetus arising from Zofran use during pregnancy.

69.     The FDA recently promulgated a final rule declaring that, as of June 2015, it will require pharmaceutical manufacturers to remove the current A, B, C, D, or X pregnancy categorization designation from all drug product labeling and instead summarize the risks of using a drug during pregnancy, discuss the data supporting that summary, and describe relevant information to help health care providers make prescribing decisions and counsel women about the use of drugs during pregnancy and lactation. 79 Fed. Reg. 72064 (Dec. 4, 2014). In promulgating this rule, the FDA "determined that retaining the pregnancy categories is inconsistent with the need to accurately and consistently communicate differences in degrees of fetal risk."

70.     In summary, beginning years before Plaintiff was exposed to Zofran, Defendant GSK marketed and sold Zofran without adequate warning to healthcare providers and consumers that Zofran was causally associated with an increased risk

of birth defects, and that Defendant GSK had not adequately tested Zofran to support marketing and promotion it for use in pregnant women. This rendered the warnings accompanying Zofran inadequate and defective.

71.     Plaintiff hereby demands that Defendant GSK immediately cease the wrongful conduct alleged herein for the benefit of Plaintiff and similarly situated mothers and mothers-to-be, as Defendant GSK's wrongful conduct alleged herein is continuing. Plaintiff further demands that Defendant GSK fully and fairly comply, no later than June 2015, to remove the Pregnancy Category B designation from its drug product labeling for Zofran and fully and accurately summarize the risks of using Zofran during pregnancy, fully and accurately describe the data supporting that summary, and fully and accurately describe the relevant information to help health care providers make informed prescribing decisions and counsel women about the risks associated with use of Zofran during pregnancy.

### Defendant GSK's Fraudulent. Off-Label Promotion of Zofran for the Treatment of Morning Sickness in Pregnant Women

72.     At all relevant times, Defendant GSK has known that the safety of Zofran for use in human pregnancy has not been established.

73.     But with more than six million annual pregnancies in the United States since 1991 and an estimated 70-85% incidence of pregnancy-related nausea, the absence of a prescription medication that was approved by the FDA for pregnancy-related nausea presented an extremely lucrative business opportunity for Defendant

GSK to expand its sales of Zofran. Defendant GSK seized that opportunity, but the effect of its conduct was tantamount to experimenting with the lives of unsuspecting mothers-to-be and their babies in the United States and in this State.

74. After the FDA approved Zofran in 1991, and despite available evidence showing that Zofran presented an unreasonable risk of harm to babies exposed to Zofran prenatally, Defendant GSK launched a marketing scheme to promote Zofran to obstetrics and gynecology (Ob/Gyn) healthcare practitioners, among others, as a safe treatment alternative for morning sickness in pregnant women.

75. On March 9, 1999, the FDA's Division of Drug Marketing, Advertising and Communications (DDMAC) notified Defendant GSK that the FDA had become aware of Defendant GSK's promotional materials for Zofran that violated the Federal Food Drug and Cosmetic Act and its implementing regulations. The FDA reviewed the promotional material and determined that "it promotes Zofran in a manner that is false or misleading because it lacks fair balance." (FDA Ltr. to Michele Hardy, Director, Advertising and Labeling Policy, GSK, Mar. 9 1999.)

76. Defendant GSK's promotional labeling under consideration included promotional statements supporting the effectiveness of Zofran, such as "Zofran Can," "24-hour control," and other promotional messages. But the promotional

labeling failed to present any information regarding the risks associated with use of Zofran.

77.    In its March 9, 1999 letter, the FDA directed Defendant GSK to **"immediately cease distribution of this and other similar promotional materials for Zofran that contain the same or similar claims without balancing risk information."**

78.    Defendant GSK blatantly disregarded this mandate by the FDA. For example, in 2002, Defendant GSK's marketing materials to Ob/Gyn practitioners emphasized Zofran's "Pregnancy Category B" designation on the very first page of the marketing material, creating a false impression that the safety of use in pregnancy has been established. Defendant GSK's materials failed to disclose any of its internal information concerning the risks of birth defects associated with Zofran treatment during pregnancy.

79.    Defendant GSK's promotion of Zofran for use in pregnancy eventually led to a federal governmental investigation. On July 2, 2012 the Department of Justice announced that Defendant GSK "agreed to plead guilty and pay $3 billion to resolve its criminal and civil liability arising from the company's unlawful promotion of certain prescription drugs," which included Zofran among numerous others. *See* DOJ Press Release, *GlaxoSmithKline to Plead Guilty and Pay $3 Billion to Resolve Fraud Allegations and Failure to Report Safety Data* (July 2,

2012).

80.     Part of Defendant GSK's civil liability to the government included payments arising from the facts that: (a) Defendant GSK promoted Zofran and disseminated false representations about the safety and efficacy of Zofran concerning pregnancy-related nausea and hyperemesis gravidarum, a severe form of morning sickness; and (b) Defendant GSK paid and offered to pay illegal remuneration to health care professionals to induce them to promote and prescribe Zofran.

<u>**Plaintiffs' Exposures to Zofran**</u>

81.     Plaintiff Julie Hunter is the mother and next friend of Talon Hunter.

82.     To alleviate the symptoms of morning sickness and prevent them from recurring, Plaintiff Julie Hunter was prescribed Zofran beginning early in her first trimester of pregnancy with Plaintiff Talon Hunter.

83.     Plaintiff Talon Hunter was born in 2006.

84.     Plaintiff Talon Hunter was diagnosed with kidney defects, oral defects and numerous other congenital defects as a direct and proximate result of his prenatal exposures to Zofran.

85.     There is no history of birth defects in Plaintiff Talon Hunter's family, and genetic testing has failed to detect a genetic anomaly in his parents. In fact, before Plaintiff Talon Hunter was born, Plaintiff Julie Hunter gave birth to Plaintiff

Talon Hunter's two healthy older siblings following pregnancies in which she had not been treated with Zofran.

86.    Plaintiff Julie Hunter did not know and had no reason to know of the dangerousness of Zofran or the fraudulent nature of Defendant GSK's marketing of Zofran when she filled her prescriptions and took Zofran during pregnancy.  She did not become aware of the dangerousness of Zofran and the fraud of Defendant GSK until April 2015.

87.    Had Plaintiff Julie Hunter and/or her healthcare providers known of the increased risk of birth defects, Plaintiff Talon Hunter would not have been born with congenital malformations.

88.    As a direct and proximate result of Defendant GSK's conduct, Plaintiff Julie Hunter and her son Talon Hunter have suffered and incurred harm including severe and permanent pain and suffering, mental anguish, medical expenses and other economic and noneconomic damages, and will require more constant and continuous medical monitoring and treatment than had they not been exposed to Zofran.

89.    Plaintiff files this lawsuit within the applicable limitations period of first suspecting that Zofran caused the appreciable harm sustained by her son, Talon Hunter. Plaintiff could not, by the exercise of reasonable diligence, have discovered the fraud of Defendant GSK and the wrongful cause of the injuries at

an earlier time. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the tortious nature of the conduct causing the injuries, until a short time before filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendant GSK has misrepresented to the public and to the medical profession that Zofran is safe for use in pregnancy, and Defendant GSK has fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

## COUNT I
## NEGLIGENCE

90.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs as if set forth in this Count in their entirety.

91.    Defendant GSK had a duty to exercise reasonable care, and comply with existing standards of care, in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, and/or distribution of Zofran into the stream of commerce, including a duty to ensure that the product would not cause users to suffer unreasonable, dangerous side effects.

92.    Defendant GSK failed to exercise ordinary care and failed to comply with existing standards of care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Zofran into interstate commerce in that

Defendant GSK knew or should have known that using Zofran created an unreasonable risk of dangerous birth defects, as well as other severe personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

93.     Defendant GSK, its agents, servants, and/or employees, failed to exercise ordinary care and failed to comply with existing standards of care in the following acts and/or omissions:

    a. Failing to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety risks of Zofran for treating pregnant women while promoting the use of Zofran and providing kickbacks to health care professionals to convince health care professionals to prescribe Zofran for pregnancy-related nausea;

    b. Marketing Zofran for the treatment of morning sickness in pregnant women without testing it to determine whether or not Zofran was safe for this use;

    c. Designing, manufacturing, producing, promoting, formulating, creating, and/or designing Zofran without adequately and thoroughly testing it;

d. Selling Zofran without conducting sufficient tests to identify the dangers posed by Zofran to pregnant women;

e. Failing to adequately and correctly warn the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers of Zofran for pregnant women;

f. Failing to evaluate available data and safety information concerning Zofran use in pregnant women;

g. Advertising and recommending the use of Zofran without sufficient knowledge as to its dangerous propensities to cause birth defects;

h. Representing that Zofran was safe for treating pregnant women, when, in fact, it was and is unsafe;

i. Representing that Zofran was safe and efficacious for treating morning sickness and hyperemesis gravidarum when Defendant GSK was aware that neither the safety nor efficacy for such treatment has been established;

j. Representing that Defendant GSK's animal studies in rats and rabbits showed no harm to fetuses, when the data revealed impairment of ossification (incomplete bone growth) and other signs of toxicity;

k. Failing to provide adequate instructions regarding birth defects including cleft palate and cardiac malformations;

l. Failing to accompany Zofran with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Zofran;

m. Failing to include a black box warning concerning the birth defects associated with Zofran;

n. Failing to issue sufficiently strengthened warnings following the existence of reasonable evidence associating Zofran use with the increased risk of birth defects;

o. Failing to advise Plaintiff, her healthcare providers, FDA, and the medical community that neither the safety nor the efficacy of Zofran for treating pregnancy-related nausea has been established and that the risks of using the drug for that condition outweigh any putative benefit; and

p. Failing to advise Plaintiff, her healthcare providers, FDA, and the medical community of clinically significant adverse reactions (birth defects) associated with Zofran use during pregnancy.

94. Despite the fact that Defendant GSK knew or should have known that Zofran significantly increased the risk of birth defects, Defendant GSK continued and continues to negligently and misleadingly market, manufacture, distribute and/or sell Zofran to consumers, including Plaintiff.

95.     Defendant GSK knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendant GSK's failure to exercise ordinary care, as set forth above.

96.     Defendant GSK's negligence was the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

97.     Had Plaintiff Julie Hunter not taken Zofran, her baby would not have suffered those injuries and damages as described herein with particularity.

98.     As a result of the foregoing acts and omissions, Plaintiff Talon Hunter was caused to suffer serious birth defects that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

99.     As a result of the foregoing acts and omissions, Plaintiff Talon Hunter requires and will require more health care and services in the future.  Plaintiff Talon Hunter did incur medical, health, incidental and related expenses and will incur such expenses in the future.

100.  By reason of the foregoing, Plaintiff Talon Hunter has been damaged by Defendant GSK's wrongful conduct. Defendant GSK's conduct was willful, wanton, reckless, and, at the very least arose to the level of gross negligence so as to indicate a disregard of the rights and safety of others, justifying an award of

punitive damages.

## COUNT II
## NEGLIGENCE PER SE

101.  Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs as if set forth in this Count in their entirety.

102.  Defendant GSK had a duty to exercise reasonable care, and comply with existing laws, in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, and/or distribution of Zofran into the stream of commerce, including a duty to ensure that the product would not cause users to suffer unreasonable, dangerous side effects.

103.  Defendant GSK failed to exercise ordinary care and failed to comply with existing laws in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Zofran into interstate commerce in that Defendant GSK knew or should have known that using Zofran created an unreasonable risk of dangerous birth defects, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

104. Defendant GSK, its agents, servants, and/or employees, failed to

exercise ordinary care and violated 21 U.S.C. § 331, 352; 42 U.S.C. § 1320a-7b, and 21 C.F.R. § 201.57, 201.128, in particular.

105. The laws violated by Defendant GSK were designed to protect Plaintiff Talon Hunter and similarly situated persons and protect against the risks and hazards that have actualized in this case. Therefore, Defendant GSK's conduct constitutes negligence per se.

106. Despite the fact that Defendant GSK knew or should have known that Zofran significantly increased the risk of birth defects, Defendant GSK continued and continues to negligently and misleadingly market, manufacture, distribute and/or sell Zofran to consumers, including Plaintiff.

107. Defendant GSK knew or should have known that consumers such as Plaintiff Talon Hunter would foreseeably suffer injury as a result of Defendant GSK's failure to exercise ordinary care, as set forth above.

108. Defendant GSK's negligence was the proximate cause of Plaintiff Talon Hunter's injuries, harm and economic loss, which Plaintiff Talon Hunter suffered and/or will continue to suffer.

109. Had Plaintiff Julie Hunter not taken Zofran, her baby would not have suffered those injuries and damages as described herein.

110. As a result of the foregoing acts and omissions, Plaintiff Talon Hunter was caused to suffer serious birth defects that are permanent and lasting in nature,

physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

111.  As a result of the foregoing acts and omissions, Plaintiff Talon Hunter requires and will require more health care and services in the future.  Plaintiff Talon Hunter did incur medical, health, incidental and related expenses and will incur such expenses in the future.

112.  By reason of the foregoing, Plaintiff has been damaged by Defendant GSK's wrongful conduct. GSK's conduct was willful, wanton, reckless, and, at the very least arose to the level of gross negligence so as to indicate a disregard of the rights and safety of others, justifying an award of punitive damages.

**COUNT III**
**ALABAMA EXTENDED MANUFACTURERS LIABILITY DOCTRINE**

113.  Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs as if set forth in this Count in their entirety.

114. Zofran was designed, formulated, produced, manufactured, sold, marketed, distributed, supplied and/or placed into the stream of commerce by Defendant GSK and was defective at the time it left Defendant GSK's control in that, and not by way of limitation, the drug failed to include adequate warnings, instructions and directions relating to the dangerous risks associated with the use of

Zofran to treat pregnancy-related nausea. Zofran also was defective in its design because the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design. Safe and effective products were available for the purpose for which Defendant GSK marketed Zofran in pregnant women, and neither the safety nor the efficacy of Zofran for that purpose had been established.

115. Defendant GSK failed to provide adequate warnings to physicians and users, including Plaintiff Julie Hunter, of the increased risk of birth defects associated with Zofran and aggressively promoted the product off-label to doctors, to hospitals, and directly to consumers.

116. Prescribing physicians, health care providers and mothers-to-be, neither knew, nor had reason to know at the time of their use of Zofran of the existence of the aforementioned defects. Ordinary consumers would not have recognized the potential risks or side effects for which GSK failed to include appropriate warnings, and which Defendant GSK masked through unbalanced promotion of Zofran specifically for treatment of pregnant women.

117. At all times herein mentioned, due to Defendant GSK's off-label marketing of Zofran, the drug was prescribed and used as intended by Defendant GSK and in a manner reasonably foreseeable to Defendant GSK.

118. As a direct and proximate result of the defective nature of Zofran,

Plaintiff Talon Hunter was caused to suffer serious birth defects that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, rendering Defendant GSK liable to Plaintiff Talon Hunter pursuant to the Alabama Extended Manufacturers Liability Doctrine.

119.  As a result of the foregoing acts and omissions, Plaintiff Talon Hunter requires and will require more health care and services in the future.  Plaintiff Talon Hunter did incur medical, health, incidental and related expenses and will incur such expenses in the future.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**

120.  Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs as if set forth in this Count in their entirety.

121.  Defendant GSK falsely and fraudulently represented to the expectant mothers, including Plaintiff Julie Hunter and her providers, and the medical and healthcare community, that:

    a.  Zofran was safe and effective for treating pregnancy-related nausea;

    b.  Zofran had been adequately tested and studied in pregnant women;

    c.  Zofran use during pregnancy did not increase the risk of bearing children with birth defects; and

      d. Zofran's "Pregnancy Category B" designation established the safety

          and efficacy of Zofran for treating pregnancy-related nausea.

122. The representations made by Defendant GSK were material, false and misleading.

123. When Defendant GSK made these representations, it knew they were false.

124. Defendant GSK made these representations with the intent of defrauding and deceiving the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, including Plaintiff Julie Hunter and her providers, to recommend, prescribe, dispense and/or purchase Zofran to treat pregnancy-related nausea, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of Plaintiff Julie Hunter.

125. At the time the aforesaid representations were made by Defendant GSK and, at the time Plaintiff Julie Hunter used Zofran, she was unaware of the falsity of said representations and reasonably believed them to be true.

126. In reliance upon said representations, Plaintiff's doctors were caused to prescribe Zofran to her, and Plaintiff Julie Hunter was caused to and did use Zofran to treat pregnancy-related nausea.

127. Defendant GSK knew that Zofran had not been sufficiently tested for pregnancy-related nausea and that it lacked adequate warnings.

128. Defendant GSK knew or should have known that Zofran increases expectant mothers' risk of developing birth defects.

129. As a result of the foregoing acts and omissions, Plaintiff Talon Hunter was caused to suffer birth defects that are permanent and lasting in nature, as well as physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

130. Plaintiff Julie Hunter also has sustained severe emotional distress and suffering as a result Defendant GSK's wrongful conduct and the injuries to her child.

131. As a result of the foregoing acts and omissions, Plaintiff Talon Hunter requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff Julie Hunter is informed and believes and further alleges that her child will in the future be required to obtain further medical and/or hospital care, attention, and services.

132. By reason of the foregoing, Plaintiffs have been damaged by Defendant GSK's wrongful conduct. Defendant GSK's conduct was willful, wanton, reckless, and, at the very least arose to the level of gross negligence so as to indicate a disregard of the rights and safety of others, justifying an award of

punitive damages.

## COUNT V
## FRAUDULENT CONCEALMENT

133.  Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs as if set forth in this Count in their entirety.

134.  In representations to healthcare providers, expectant mothers including Plaintiff Julie Hunter and her doctors and the FDA,  Defendant GSK fraudulently concealed and intentionally omitted the following material facts:

a.  Defendant GSK was illegally paying and offering to pay doctors remuneration to promote and prescribe Zofran for the treatment of morning sickness;

b.  Zofran had not (and has not) been tested or studied in pregnant women at all;

c.  *in utero* Zofran exposure increases the risk of birth defects;

d.  the risks of birth defects associated with the consumption of Zofran by pregnant women were not adequately tested prior to GSK's marketing of Zofran;

e.  the safety and efficacy of Zofran for treating pregnancy-related nausea has not been established;

f.  Zofran is not safe and effective for treating pregnancy-related nausea;

and

g. Defendant GSK's internal data and information associated Zofran use during pregnancy with birth defects.

135. Defendant GSK's concealment and omissions of material facts concerning, among other things, the safety and efficacy of Zofran for pregnancy-related nausea was made purposefully, willfully, wantonly, and/or recklessly, to mislead physicians, hospitals and healthcare providers, and expectant mothers including Plaintiff Julie Hunter and her doctors into reliance, continued use of Zofran, and to cause them to promote, purchase, prescribe, and/or dispense Zofran.

136. Defendant GSK knew that physicians, hospitals, healthcare providers and expectant mothers such as Plaintiff had no way to determine the truth behind Defendant GSK's concealment and material omissions of facts surrounding Zofran, as set forth herein.

137. Plaintiff Julie Hunter and her providers reasonably relied on Defendant GSK's promotional statements concerning Zofran's asserted safety and efficacy in pregnant women, from which Defendant GSK negligently, fraudulently and/or purposefully omitted material facts.

138. As a result of the foregoing acts and omissions, Plaintiff Talon Hunter was caused to suffer serious birth defects, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental

anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

139.  Plaintiff Julie Hunter also has sustained severe emotional distress and suffering as a result Defendant GSK's wrongful conduct and the injuries to her child.

140.  As a result of the foregoing acts and omissions, Plaintiff Talon Hunter requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff Julie Hunter is informed and believes and further alleges that her child will in the future be required to obtain further medical and/or hospital care, attention, and services.

141.  By reason of the foregoing, Plaintiffs have been damaged by Defendant GSK's wrongful conduct. Defendant GSK's conduct was willful, wanton, reckless, and, at the very least arose to the level of gross negligence so as to indicate a disregard of the rights and safety of others, justifying an award of punitive damages.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

142.  Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs as if set forth in this Count in their entirety.

143.  Defendant GSK falsely and negligently represented to the medical

community and expectant mothers, including Plaintiff and her healthcare providers, that:

     a. Zofran was safe and effective for treating pregnancy-related nausea;

     b. Zofran had been adequately tested and studied in pregnant women;

     c. Zofran use during pregnancy did not increase the risk of bearing children with birth defects; and

     d. Zofran's "Pregnancy Category B" designation established the safety and efficacy of Zofran for treating pregnancy-related nausea.

144. The representations made by Defendant GSK were, in fact, false and misleading.

145. As a result of the foregoing acts and omissions, Plaintiff Talon Hunter has suffered serious birth defects, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

146. As a result of the foregoing acts and omissions, Plaintiff Talon Hunter requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff Julie Hunter is informed and believes and further alleges that Plaintiff Talon Hunter will in the future be required to obtain further medical and/or hospital care, attention, and services.

147. Plaintiff Julie Hunter also has sustained severe emotional distress and suffering as a result Defendant GSK's wrongful conduct and the injuries to her child.

148. By reason of the foregoing, Plaintiffs have been damaged by Defendant GSK's wrongful conduct. Defendant GSK's conduct was willful, wanton, reckless, and, at the very least arose to the level of gross negligence so as to indicate a disregard of the rights and safety of others, justifying an award of punitive damages.

## COUNT VII
## BREACH OF EXPRESS WARRANTY

149. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs as if set forth in this Count in their entirety.

150. Defendant expressly warranted that:

    a. Zofran was safe and effective for treating pregnancy-related nausea;

    b. Zofran had been adequately tested and studied in pregnant women;

    c. Zofran use during pregnancy did not increase the risk of bearing children with birth defects; and

    d. Zofran's "Pregnancy Category B" designation established the safety and efficacy of Zofran for treating pregnancy-related nausea.

151. Zofran does not conform to these express representations because

Zofran is not safe and presents an unreasonable risk of serious side effects, including birth defects and intrauterine death, which were not warned about by Defendant GSK. As a direct and proximate result of the breach of said warranties, Plaintiff suffered and will continue to suffer severe and permanent personal injuries, harm, mental anguish and economic loss.

152.   As a result of the foregoing breach of warranty, Plaintiff Talon Hunter was caused to suffer serious and dangerous side effects including life-threatening birth defects, physical pain and mental anguish, and also including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

153.   As a result of the foregoing breach of warranty, Plaintiff Talon Hunter requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff Julie Hunter is informed and believes and further alleges that Plaintiff Talon Hunter will in the future be required to obtain further medical and/or hospital care, attention, and services.

154.   By reason of the foregoing, Plaintiff Talon Hunter has been damaged by Defendant GSK's breach of warranty.

**COUNT VIII**
**BREACH OF IMPLIED WARANTY OF MERCHANTABILITY**
**AND FITNESS FOR PARTICULAR USE**

155.   Plaintiffs repeat, reiterate and reallege each and every allegation of this

Complaint contained in each of the foregoing paragraphs as if set forth in this Count in their entirety.

156. Defendant GSK is a merchant with respect to goods of the kind Plaintiff received. Defendant GSK impliedly warranted that its product was merchantable. Defendant GSK impliedly warranted that its product was fit for the particular purpose of being used safely in the treatment of pregnancy related nausea. Plaintiff and her health care providers relied on Defendant GSK's skill and judgment when deciding to use Defendant GSK's product.

157. Defendant GSK's product was not fit for the ordinary purpose for which such goods were used. It was defective in design and failed to provide adequate warnings and instructions, and was unreasonably dangerous. Defendant GSK's product was dangerous to an extent beyond the expectations of ordinary consumers with common knowledge of the product's characteristics, including Plaintiff and her medical providers.

158. Defendant GSK breached its implied warranties because the product was not safe, not adequately packaged and labeled, did not conform to representations Defendant GSK made, and was not properly usable in its current form according to the labeling and instructions provided.

159. As a result of the foregoing breach of warranty, Plaintiff Talon Hunter was caused to suffer serious and dangerous side effects including, life-threatening

birth defects, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

160.  As a result of the foregoing breach of warranty, Plaintiff Talon Hunter requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff Julie Hunter is informed and believes and further alleges that Plaintiff Talon Hunter will in the future be required to obtain further medical and/or hospital care, attention, and services.

161.  By reason of the foregoing, Plaintiff Talon Hunter has been damaged by Defendant GSK's breach of warranty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant GSK on each of the above-referenced claims and Counts as follows:

a)  For general damages in a sum in excess of the jurisdictional minimum of this Court;

b)  For medical, incidental and hospital expenses which have been incurred in the past and will be incurred in the future;

c)  For pre-judgment and post-judgment interest as provided by law;

d)  For full refund of all purchase costs of Zofran;

e)   For consequential damages in excess of the jurisdictional minimum of this Court;

f)   For compensatory damages in excess of the jurisdictional minimum of this Court;

g)   For punitive damages in an amount in excess of any jurisdictional minimum of this Court in an amount sufficient to deter similar conduct in the future and punish the Defendant for the conduct described herein;

h)   For attorneys' fees, expenses and costs of this action;

i)   For injunctive relief requiring the Defendant to provide adequate warnings and labeling for Zofran and to perform such studies as are necessary and adequate to further determine and document the dangers of Zofran for the treatment of morning sickness; and

j)   For such further and other relief as this Court deems necessary, just and proper.

Respectfully submitted this 18th day of May, 2015.

*/s/ Lloyd W. Gathings*
Lloyd W. Gathings (asb-1365-g581)
Honora M. Gathings (asb-2332-g70h)
William Lattimore (asb-7576-l62l)
Attorneys for Plaintiffs

Plaintiff's Address:
5020 County Road 85
Clanton, AL  35046


## JURY DEMAND


PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY ON ALL COUNTS.


*/s/ Lloyd Gathings*
Of Counsel


## CERTIFICATE OF SERVICE

This is to certify that a copy of the above and foregoing was served on the following via U.S. Mail this 18th day of May, 2015.

Bryan A. Coleman
Maibeth J. Porter
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203
mporter@maynardcooper.com
bcoleman@maynard.cooper.com


*/s/ Lloyd W. Gathings*
OF COUNSEL